## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**TIMOTHY J. MAZIQUE**                                           **CIVIL ACTION**

**VERSUS**                                                               **NO. 17-6675**

**WARDEN ALVIN ROBINSON**                               **SECTION: "R"(3)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Timothy J. Mazique, is a state prisoner incarcerated in Plain Dealing, Louisiana. On March 27, 2009, he was convicted of aggravated incest and pornography involving juveniles under Louisiana law.[1]  On April 29, 2009, he was sentenced on the aggravated incest conviction to a term of ten years imprisonment and on the pornography conviction to a concurrent term of one year imprisonment.[2]  On April 27, 2010, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and his sentence on the aggravated incest conviction; however, the court vacated his sentence on the pornography conviction as illegally lenient and remanded the matter for

---

[1] State Rec., Vol. 3 of 3, trial transcript, p. 687; State Rec., Vol. 1 of 3, minute entry dated March 27, 2009.
[2] State Rec., Vol. 3 of 3, transcript of April 29, 2009; State Rec., Vol. 1 of 3, minute entry dated April 29, 2009.

resentencing on that count.[3]  On May 6, 2010, the state district court resentenced him on the pornography conviction to a concurrent term of two years imprisonment.[4]  The Louisiana Supreme Court then denied his related writ application on December 17, 2010.[5]

On or about January 11, 2013, petitioner filed an application for post-conviction relief with the state district court.[6]  That application was denied on February 21, 2013;[7] however, the Louisiana Fifth Circuit Court of Appeal granted his related writ application and remanded the matter to the district court.[8]  On June 17, 2014, the state district court again denied relief.[9]  His related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on September 12, 2014,[10] and February 23, 2016,[11] and by the Louisiana Supreme Court on June 16, 2017.[12]

Petitioner filed the instant federal habeas corpus application on July 7, 2017.[13]  The state has filed a response in opposition, conceding that petitioner's claims are exhausted but arguing that they have no merit.[14]  Petitioner has filed a reply to the state's response.[15]

---

[3] State v. Mazique, 40 So.3d 224 (La. App. 5th Cir. 2010); State Rec., Vol. 2 of 3.
[4] State Rec., Vol. 3 of 3, transcript of May 6, 2010.
[5] State v. Mazique, 51 So.3d 19 (La. 2010); State Rec., Vol. 1 of 3.
[6] State Rec., Vol. 2 of 3.
[7] State Rec., Vol. 2 of 3, Reasons for Denial dated February 21, 2013.
[8] Mazique v. District Court Judges, 29th Judicial District Court, No. 13-KH-277 (La. App. 5th Cir. Apr. 16, 2013); State Rec., Vol. 2 of 3.
[9] State Rec., Vol. 2 of 3, transcript of June 17, 2014.
[10] State v. Mazique, 14-KH-543 (La. App. 5th Cir. Sept. 12, 2014); State Rec., Vol. 2 of 3.
[11] State v. Mazique, No. 16-KH-67 (La. App 5th Cir. Feb. 23, 2016); State Rec., Vol. 2 of 3.
[12] State ex rel. Mazique v. State, No. 2016-KH-0528, 2017 WL 2609623 (La. June 16, 2017); State Rec., Vol. 2 of 3.
[13] Rec. Doc. 1.
[14] Rec. Doc. 7.  In its response, the state acknowledges the existence of a one-year limitations period for seeking federal relief but does not address the timeliness of petitioner's application.  Although it appears that the application may in fact be untimely, the undersigned is under no obligation to raise that affirmative defense on the state's behalf and declines to do so in the instant case.  See Day v. McDonough, 547 U.S. 198, 209-10 (2006) ("[W]e hold that district courts are permitted, but not obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition. If, as this Court has held, district judges have no obligation to act as counsel or paralegal to pro se litigants, then, by the same token, they surely have no obligation to assist attorneys representing the State." (citations, quotation marks, footnote, and brackets omitted)).
[15] Rec. Doc. 9.

# I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court

precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

## II.  Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this

case as follows:

> At trial, Detective Joseph Lemoine of the St. Charles Parish Sheriff's Office testified that he was contacted by the State police in reference to a complaint from C.M. who had stated that her daughter had been sexually molested by Mazique. The victim stated that her stepfather had come to her bed on a number of instances and masturbated over her.  Mazique's cell phone was obtained, along with that of T.J., and the images were examined.  C.M. had taken the memory card from her husband's cell phone and brought it to the bureau, placing it in Mazique's computer. The images were of the victim naked, including a video of Mazique and the victim. The video did not show the victim's face.  However, T.J. stated that all of the pictures were of her.  She further stated that Mazique had her take nude photographs of herself and forward them to his cell phone.  The police also photographed various rooms in the victim's home.  Following the investigation, Mazique was arrested and, after waiving his rights, gave a statement.

> C.M. testified that, on April 15, 2008, she had an argument with Mazique after he came home during the early morning and she left for work without telling him goodbye.  Mazique telephoned her while she was on the way to work and said that, if she could not tell him goodbye, his other "boos" would do so.  After that, C.M. turned around and went home.  Because her suspicions were aroused, she went to Mazique's truck, took his cell phone, and brought it with her to work.  At lunch time, when she started looking at the cell phone, she recognized some pictures of a couple of different females.  The one that caught her attention was the upper body shot of a topless young woman who was "unusually large" like T.J.  She recognized the wallpaper in the background.  She also recognized the blouse being worn by the person in the picture as being her daughter's blouse.  C.M. e-mailed those pictures to Mazique's sister, Dominique Miller, and Ms. Miller agreed that it was definitely T.J.

> C.M. left work and picked up T.J. near their house.  They drove to Chili's and sat in the parking lot, where C.M. asked T.J. if she had ever taken nude pictures. At first, T.J. responded negatively, but when C.M. showed T.J. some photographs, T.J. admitted that was her.  C.M. asked T.J. how this came about, and T.J. told C.M. she herself had taken the photographs.  She also asked T.J. how they got on Mazique's cell phone, and T.J. told her the story.  They went back home and, after he woke up, Mazique asked C.M. if she had his cell phone.  She answered affirmatively, told him what she found on his cell phone, and asked him how the photographs got there. Mazique told her that he found the pictures on his computer, and he took a picture of them with his cell phone, thinking that T.J. had been sending them to a boy.  C.M. said she did not understand why he kept the pictures on his cell phone so long and why he did not tell her about them.  Mazique kept talking about a video and saying it was of an old girlfriend, but C.M. had not examined any videos.

C.M. went back to work the next day and looked at every video on the cell phone. She thought she recognized T.J. in one of them, especially because she thought she heard something on the video. C.M. saw Mazique clearly on the video, and she thought the female looked like T.J., but, since the female was bent over, she had to ask T.J. if that was her. C.M. left work, checked T.J. out of school, and took her to a hotel. C.M. showed T.J. the video, and T.J. started crying immediately. T.J. told C.M. that it was her on the video.

While Mazique was in jail, he wrote C.M. a letter asking her for another chance, and he said he would change. In that letter, he said that he was ashamed, that he was sorry he put her through this, that he made a mistake, and that he took all the blame. C.M. explained that the letter also could have meant that he would change with respect to his substance abuse problem and that he would no longer commit adultery.

T.J., age 16 at the time of trial, testified that she, her stepfather Mazique, and her mother (C.M.) lived together in a house in Montz in St. Charles Parish. They moved into that house in July 2007. A few months after they moved in, Mazique called her on his cell phone late one night and asked her to let him in the house because the alarm was on. Mazique had a key and T.J. thought he just wanted to be quiet. Mazique, who was drunk, came to her room with a towel, lay next to her, and started "humping" on her. He asked her to play with his nipples while he masturbated on the side of her bed. Afterwards, he cleaned "it" up with the towel.

The next day, T.J. asked Mazique if he knew what he had done, and he replied negatively. She told him, and he said he was sorry. Later that day, he came back and asked her to "do it again," and she complied. Mazique told T.J. that her mother would be upset if she found out what had occurred. A couple of weeks later, the incident reoccurred, and then continued once or twice a week for about a month. At that point, Mazique asked T.J. to masturbate him, which she did. This occurred about once or twice a week for two months. While they were on a trip in Texas, Mazique also performed oral sex on T.J. A few weeks after the trip when they got home, Mazique performed oral sex on T.J. a second time. At some point (between July 2007 and April 18, 2008), Mazique asked T.J. to make a videotape of their activities, and she agreed. On the couch in the living room of their house, he videotaped himself masturbating on T.J.'s buttocks while she was lying down. At another time, Mazique sent her a text message. Right afterwards, T.J. took nude photographs of her breasts, buttocks, and vagina while she was in the bathroom at Mazique's mother's house and, subsequently, sent those photographs to Mazique's cell phone.

Mazique showed T.J. the video right after it was taken, and again a few weeks later, saying, "Look at you."

Kristen Deville testified that she was a computer forensic examiner with the Attorney General's Office in the Department of Justice and had been employed by them in that capacity since 2006. She explained that, as a computer forensic examiner, she obtained digital evidence and extracted data from it, and that she drew pictures or files needed for a case from that.

Ms. Deville subsequently testified that she found images on Mazique and T.J.'s cell phones, and that she found one image on T.J.'s cell phone that was also

on Mazique's cell phone.  On Mazique's phone, she found several nude images of a young girl.  She also found a video showing a subject masturbating behind the young girl.  She extracted dates and times using the "incase program," a forensic software program, and she explained that dates and times were automatically extracted along with the photographs.  She prepared reports in two different forms: one containing the images, and one without, identifying her most recent report as State's Exhibit 8, which contained updated dates and times.

The report indicates that photos found on Mazique and T.J.'s cell phones appear to show the victim nude and displaying genitals.  It also indicates that Mazique's cell phone contained a video that appears to show "the suspect" masturbating behind T.J.  According to the report, a different picture set showing a woman displaying genitals and a video of a man and woman having sex were found on that cell phone.

Sheena Jones, a Montessori educator at Audubon Charter School, testified that she and Mazique had been in a relationship since 2000, and that the relationship was a sexual one between 2003 and 2007.  Jones testified that she had made the video in question with him.  She explained that, in October 2007, she went to the funeral of her nephew, after which she went to Mazique's house where they made the video.  She recalled a leather sofa being in the living room and described the layout of the house.  Ms. Jones asserted that Mazique had given her directions to the house, that she arrived between 2:00 and 3:00 p.m., and that she left between 3:00 and 4:00 p.m.

Marian Brown, Mazique's mother, testified that her son was promiscuous, but that she did not see any indication that anything was occurring between him and T.J.  She further testified that she and T.J. had been very close and that sometimes she stayed with her after school and some evenings when her mother was out of town.

Dominique Miller, Mazique's sister, testified that she and T.J. were very close, but that she never saw any indication that T.J. was molested.  She noted that T.J. was happy and on the honor roll.  Mazique told her that he had taken the pictures on his cell phone off the computer screen and did not tell C.M. about it because C.M. was pregnant at the time.

Vanessa Williams, Mazique's ex-wife, testified that their biological daughter had been molested and that Mazique was devastated about it and became more protective of his biological daughter.  She asserted that, when she and Mazique were married and sexually active, they made videos of themselves. Michael Stykes, Mazique's co-worker at Shell Oil Company and a good friend, testified that a week before Mazique was arrested, he told Stykes that he had photographs of T.J. on his cell phone, and he asked Mr. Stykes what he should do about it.  Stykes did not know they were nude photos but advised Mazique to tell T.J.' s mother.  When Mr. Stykes asked Mazique why he had not told his wife about them, he replied that she would "trip."  Mr. Stykes did not know they were nude photographs, and he never saw inappropriate activity between Mazique and T.J.

Mazique testified that he had known T.J. since she was a small child, that they had a great relationship, and that he did not molest her or take lewd pictures of her but had found the photographs.  He explained that he was promiscuous and

had "cheated" on C.M. and that she went through his belongings because she was jealous and did not trust him.  He stated that she knew his passwords and how to access all his accounts.  Mazique admitted having adult pornography on his cell phone, including several adult videos, and that he had nude photographs at work of adult women he had dated.  He did not approve of child pornography.  He admitted that he and Ms. Jones should not have made that video.  He also admitted that he lied to C.M. when he told her that it was an old video.

Mazique stated that, after he found the photographs of T.J., he talked to her about them, and she begged him not to tell her mother.  T.J. told him she took them because she was curious about her body.  He testified that he found the photographs of T.J. on the computer at home about two weeks before C.M. confronted him and that he did not ask T.J. to take them.  He claimed that T.J. did not send those photographs to him.  Mazique testified that he was waiting for an appropriate time to tell C.M. about the nude pictures of T.J. because he did not want to upset C.M. due to her pregnancy and that he kept the pictures because he did not want T.J. to delete them before he could talk to her mother.  Mazique told C.M. and Detective Lemoine that he took the photographs of T.J. with his cell phone from the computer.

He explained that he had found other photographs of T.J. on her MySpace page, and that he had set up a fictitious page on MySpace to police her activity.  He admitted that he had the opportunity to be alone with T.J. on many occasions, as he did shift work, and there was time between when T.J. got off school and her mother came home from work when they were alone.

On rebuttal, T.J. testified that she never came home from school and found a female visiting Mazique.  C.M. testified that the sofa was made of fabric, and not leather.  She further testified that Mazique kept his phone locked up.[16]

### III.  Petitioner's Claims

### A.  Ineffective Assistance of Counsel

Petitioner's first claim is that he received ineffective assistance of counsel.  Ineffective assistance of counsel claims must be analyzed under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984).  In Strickland, the United States Supreme Court established a two-prong test for evaluating such claims.  Specifically, a petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel

---

[16] State v. Mazique, 40 So.3d 224, 228-32 (La. App. 5th Cir. 2010); State Rec., Vol. 2 of 3.

was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Because petitioner's ineffective assistance of counsel claim was rejected by the state courts on the merits in the state post-conviction proceedings, and because such claims present mixed questions of law and fact, this Court must defer to the state court decision rejecting the claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims is in fact doubly deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the

very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult.  *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 105 (citations omitted; emphasis added).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claim.

In the instant case, petitioner contends that his counsel was ineffective in several respects.[17]

First, petitioner contends that his counsel was ineffective for failing to challenge the arrest warrant on the grounds that it was not signed until *after* his arrest.  The record reflects that the arrest warrant was signed at an unspecified time on April 18, 2018, the same date petitioner was arrested.  At trial, counsel questioned the arresting officer concerning the relative times of the procuring of the warrant and the effecting of the arrest, and the officer testified emphatically that the arrest occurred after the warrant was issued.[18]  Petitioner has presented no evidence whatsoever

---

[17] Rec. Doc. 1, p. 7.
[18] State Rec., Vol. 3 of 3, trial transcript, pp. 419-21.

to show otherwise.  Because he has failed to prove the factual predicate of this contention, he has not established that relief is warranted.

Second, petitioner contends that his counsel was ineffective for failing to argue that the search of his phone was illegal because it was conducted prior to the issuance of a search warrant. However, petitioner's phone was initially searched and seized by his wife without any government involvement.    That action simply did not implicate the constitutional protection against unreasonable searches and seizures.  See, e.g., United States v. Jacobsen, 466 U.S. 109, 113 (1984) ("This Court has also consistently construed this [Fourth Amendment] protection as proscribing only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." (quotation marks omitted)); United States v. Maxwell, 484 F.2d 1350, 1352 (5th Cir. 1973) ("The fourth amendment does not apply to searches and seizures conducted by private parties.").

Moreover, when petitioner's wife found the incriminating photographs and video, she gave the phone to the police for use in the case as evidence against him.  Therefore, to the extent that any search was conducted of the phone thereafter, that likewise did not violate the Fourth Amendment for the following reasons.

At trial, petitioner himself testified that, due to his history of infidelity, he had given his wife access to the phone so that she could snoop through it, stating:

> She had my passwords to everything, Yahoo, MySpace, credit card accounts, you
> name it.  I had no secrets with her.  She knew my passwords and how to access all
> of my personal information.  I hid absolutely nothing from her.  Okay.  This was a
> common thing.  She would take my phone.  She would go through anything
> pertaining to my personal belongings at work because she was very untrustworthy
> of me, and she's just a jealous woman, period.[19]

---

[19] State Rec., Vol. 3 of 3, trial transcript, p. 578.

Having granted his wife such access, petitioner no longer had a reasonable expectation of privacy with respect to the phone's contents. See Smith v. Maryland, 442 U.S. 735, 743-44 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); United States v. White, 401 U.S. 745, 752 (1971) ("Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his."). Moreover, in that his wife was authorized access to the phone, she likewise had the authority to consent to its search and use by the police in the criminal case. See Frazier v. Cupp, 394 U.S. 731, 740 (1969) (search of petitioner's duffel bag was legal, in that his cousin, who was authorized to use the duffel bag, had consented to the search).

In light of the foregoing, the search and seizure of petitioner's phone was legal, and, therefore, any motion to suppress would have been meritless. As a result, counsel's failure to file such a motion cannot be considered to constitute ineffective assistance of counsel. See Zuppo v. Carroll, 458 F. Supp. 2d 216, 226 (D. Del. 2006) ("[B]ecause there was no basis for filing a motion to suppress the property supplied [to police] by [a third party], counsel did not provide ineffective assistance."); accord United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions.").

Third, petitioner contends that his counsel was ineffective for failing to accurately investigate the mitigating circumstances of the case. As an initial matter, the Court notes that

14

petitioner has failed to establish that counsel's investigation was actually inadequate in any respect. In fact, he has presented no evidence as to what investigative steps counsel actually took or failed to take. Without such evidence, he cannot show that counsel performed deficiently. Netter v. Cain, Civ. Action No. 15-584, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), adopted, 2016 WL 7116070 (E.D. La. Dec. 7, 2016).

Further, even if petitioner had made that showing, he would then additionally have to prove that prejudice in fact resulted from the inadequate investigation. To make that showing, he must point to evidence in the record demonstrating that further investigation would have revealed additional information beneficial to the defense. See Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008). Here, petitioner has not even specified what additional evidence existed but was undiscovered, much less explained how that evidence (whatever it was) would have been beneficial to the defense.

Fourth, petitioner contends that his counsel was ineffective for failing to challenge Detective Lemoine's statements in his police report and testimony that petitioner's phone was confiscated on the day of the arrest. However, on cross-examination, defense counsel did in fact challenge Lemoine on that issue, and Lemoine reiterated that the phone was confiscated on the day of the arrest.[20] Although petitioner alleges that that the victim's mother did not in fact turn the phone over to police until two weeks later, he has produced no evidence in support of that allegation. Moreover, it is unclear why petitioner believes the date the phone was confiscated was

---

[20] State Rec., Vol. 3 of 3, trial transcript, pp. 423-24.

of particular relevance.  Petitioner's conviction obviously resulted from the victim's compelling testimony at trial, and the exact date the phone was confiscated appears to be of little, if any, importance.  For these reasons, petitioner has failed to prove that counsel's performance was deficient in this respect or that prejudice resulted.

Fifth, petitioner contends that his counsel was ineffective for failing to file a timely motion for reconsideration.  Although he does not specify, he is presumably referring to a motion to reconsider sentence.  However, "[t]he failure to file a motion to reconsider sentence does not by itself constitute ineffective assistance of counsel.  In order to prevail, the petitioner must show a reasonable probability that, but for counsel's error, his sentence would have been different."  Green v. Cain, Civ. Action No. 97-3206, 1998 WL 259970, at *7 (E.D. La. May 19, 1998).  There is no such reasonable probability in the instant case.  On the contrary, as noted *infra*, the judge in this case clearly set forth the reasons for the sentence he imposed which, in large part, were influenced by the fact that petitioner had shown no remorse for his crimes.  Based on the judge's emphatic comments, there is no reason whatsoever to believe that he would have been moved to change his sentence based on a motion to reconsider.  In such circumstances, counsel is not ineffective for failing to file such a motion.  See, e.g., Williams v. Kent, Civ. Action No. 16-6902, 2017 WL 2920013, at *22 (E.D. La. Apr. 11, 2017) ("Counsel was not ineffective in failing to pursue a motion he likely determined to be futile or meritless, and which would not have been successful or changed the outcome of the sentencing chosen by the Court."), adopted, 2017 WL 2911588 (E.D. La. July 7, 2017).

Sixth, petitioner contends that his counsel was ineffective for failing to interview and subpoena witnesses.  However, the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial

16

strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.* This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Here, petitioner has not identified the potential witnesses, proved that they were available to testify at the time of trial, and, most importantly, proved that they in fact would have testified in a manner beneficial to the defense.  Therefore, he obviously failed to meet his burden of proof with respect to this claim.  See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for

lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Seventh, petitioner contends that his counsel was ineffective for failing to move for a mistrial based on the fact that "the victim's mother tamper[ed] with the evidence (cell phone) by handling the (sim) card, stealing it from the defendant's cell phone, and using a sim card reader to play the alleged video of the defendant and a woman having sex for the state, rewriting the original date of the video." (emphasis in original). While the foregoing actions were explored at trial and could properly have been considered by the jury in determining what weight should be accorded that evidence, the actions did not fall within one of the grounds for mistrial under Louisiana law. See La. Code Crim. P. arts. 770 and 771 (setting forth valid grounds for mistrial). Accordingly, a motion for a mistrial would have had no merit, and counsel is not ineffective for failing to make a meritless motion for a mistrial. McKee v. Cain, Civ. Action No. 10-344, 2010 WL 4366041, at *9 (E.D. La. Sept. 30, 2010), adopted, 2010 WL 4362769 (E.D. La. Oct. 25, 2010); Fields v. Cain, Civ. Action No. 05-0074, 2007 WL 458208, at *4 and 17 (E.D. La. Feb. 8, 2007).

Eighth, petitioner contends that his counsel was ineffective for failing to call petitioner to testify on his own behalf at the sentencing hearing. However, a decision on whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008). Because such a matter is inherently one of strategy, federal habeas courts generally are not to second-guess counsel's such decisions; rather,

courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound strategy. Strickland, 466 U.S. at 689.

There is certainly no cause for such second-guessing here.  At sentencing, the judge noted the importance of the fact that petitioner had continued to deny his guilt or to accept responsibility for victimizing his stepdaughter, stating:

> Okay, Mr. Mazique, there were a number of opportunities that you had to finally do the right thing.  The allegation is that the first time that this happened with [the victim], you came home drunk.  And the next morning, when she confronted you, you could have done the right thing:  Apologized, asked for her forgiveness, acknowledged what had occurred.  But instead, you chose to continue the abuse.
>
> Then when it became known to others, to your wife, you once again could have done the right thing and acknowledged what you had done, begged for forgiveness, tried to make it right so that healing could begin.
>
> Then the charges were brought and a decision had to be made of whether or not you would finally do the right thing, not put [the victim] through the pain of a trial.
>
> And, basically in that trial, what it boiled down to, with all the other evidence that we heard, what it really all boiled down to was your word against hers.  Because the only way, the only way that you were not guilty, was if [the victim] was lying.  And so you put her credibility at issue.  And you made her take the stand, which had to be a very painful additional experience for her.
>
> And in all of those decisions, you thought, in my opinion, only of yourself and not what you were doing – you thought only of yourself, and the impact things had on you, and not the impact that they were having on others.  Because putting her through that trial, and saying that she was a liar, had a tremendous impact and I'm sure continues to have a tremendous impact on the relationships that she has with your family.
>
> And then now, at sentencing, you remain silent.  You still have yet to ask for her forgiveness, to admit what you've done, to show some remorse.  And, quite frankly, I don't see remorse.  I think I see someone who's only concerned with himself and has a great deal of arrogance in the way you treated women. Acknowledged that you treated women.  Not just what you did to [the victim] but what you did with other women.[21]

---

[21] State Rec., Vol. 3 of 3, transcript of April 29, 2009, pp. 11-13.

In light of those comments, it is clear that having the still-defiant petitioner testify at sentencing would not have helped his case, but, more likely, would simply have further incensed the judge and perhaps resulted in an even harsher sentence. Accordingly, there is no basis for concluding that counsel performed deficiently by opting not to have petitioner testify or that any prejudice to petitioner resulted from that decision.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He clearly has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## B.  Brady Violation

Petitioner argues that the state suppressed evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. Although his claim is somewhat unclear, he appears to be suggesting that the state failed to disclose (1) the victim's medical records showing that her hymen was intact and (2) a recording of the victim's interview with Child Protective Services.

Because the state courts denied petitioner's Brady claim on the merits in the post-conviction proceedings, the AEDPA places severe limitations on this Court's review of the state court's decision. The United States Fifth Circuit Court of Appeals has explained:

> Under AEDPA, [a federal court] do[es] not decide de novo whether a state prisoner has sufficiently proven a Brady violation. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal

court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006).

The clearly established federal law to be used in analyzing <u>Brady</u> claims is well known.

As the United States Supreme Court held:

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Brady</u> [v. Maryland, 373 U.S. 83,] 87, 83 S.Ct. 1194, [10 L.Ed.2d 215 (1963)].  Evidence qualifies as material when there is "'any reasonable likelihood'" it could have "'affected the judgment of the jury.'"  <u>Giglio</u> [v. United States, 405 U.S. 150,] 154, 92 S.Ct. 763, [31 L.Ed.2d 104 (1972)] (quoting <u>Napue v. Illinois</u>, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).  To prevail on his <u>Brady</u> claim, [a petitioner] need not show that he "more likely than not" would have been acquitted had the new evidence been admitted.  <u>Smith v. Cain</u>, 565 U.S. 73, ___ - ___, 132 S.Ct. 627, 629-631, 181 L.Ed.2d 571 (2012) (internal quotation marks and brackets omitted).  He must show only that the new evidence is sufficient to "undermine confidence" in the verdict.  <u>Ibid</u>.

<u>Wearry v. Cain</u>, 136 S. Ct. 1002, 1006 (2016).  The Supreme Court has also explained:

We have … held that the duty to disclose such evidence is applicable even though there has been no request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). …  Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor."  [<u>Kyles v. Whitley</u>, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).]  In order to comply with <u>Brady</u>, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."  <u>Kyles</u>, 514 U.S., at 437, 115 S.Ct. 1555.

<u>Strickler v. Greene</u>, 527 U.S. 263, 280-81 (1999).

Therefore, in summary:  to prevail on a <u>Brady</u> claim, a petitioner must establish three elements:  "(1) the state suppressed or withheld evidence, (2) which was both favorable and (3) material to the defense."  <u>Jackson v. Johnson</u>, 194 F.3d 641, 648 (5th Cir. 1999).

As to the portion of petitioner's <u>Brady</u> claim concerning the medical records, the claim falters on the very first prong of that analysis. Petitioner has offered no evidence whatsoever, such as an affidavit from defense counsel, in support of his bald allegation that the medical records were withheld from the defense. That failure to provide any evidence on the initial prong of the <u>Brady</u> inquiry is, in and of itself, fatal. <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *5 (E.D. La. Mar.8, 2010), <u>aff'd</u>, 434 Fed. App'x 405 (5th Cir. 2011); <u>Williams v. Cain</u>, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009), <u>aff'd</u>, 359 Fed. App'x 462 (5th Cir. 2009); <u>Watson v. Cain</u>, Civ. Action No. 06-613, 2007 WL 1455978, at *7 (E.D. La. May 17, 2007); <u>Abron v. Cain</u>, Civ. Action No. 05-876, 2006 WL 2849773, at * 10 (E.D. La. Oct.3, 2006); <u>see</u> <u>Harris v. United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him]."), <u>aff'd</u>, 216 F.3d 1072 (2nd Cir. 2000).

Further, in any event, the Court notes that petitioner's claim also fails on the "materiality" prong of the analysis. The United States Supreme Court has held:

> [E]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The reversal of a conviction is required upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 870 (2006) (internal citations and quotation marks omitted).

Here, even if, as petitioner alleges, the medical records showed that the victim's hymen was intact, that would be wholly irrelevant. Penetration is not a necessary element of either offense

of which petitioner was convicted, and it was never alleged at trial that petitioner had penetrated the victim. Therefore, evidence showing that the victim's hymen was intact was neither exculpatory nor useful for impeachment purposes.

As to the portion of petitioner's <u>Brady</u> claim concerning the interview recording, it is beyond cavil that the recording was not in fact withheld from the defense. At the state post-conviction hearing, petitioner expressly testified that *his attorney* gave him a copy of the interview recording and that he, his mother, and a friend viewed the recording *prior to trial.*[22] Because the recording clearly was not withheld from the defense, the remaining prongs of the <u>Brady</u> analysis need not be considered.

## C. Request for New Trial

Petitioner next argues that he should be granted a new trial based on (1) counsel's failure to subpoena unspecified witnesses and (2) the fact that the assistant district attorney on the case was related to petitioner. With respect to the second contention, petitioner alleges: "Defendant's father is the deceased Harry M. Robottom Jr., and the ADA Juan Byrd and defendant's first cousin (Sherrizon Rousseve Jackson) are married into the same family. Also, the ADA Juan Byrd's mother's sister (the ADA's aunt) is married to petitioner's great uncle Hubert Robottom (grandfather's brother – grandfather is Harry M. Robottom Sr.).[23]

As to petitioner's first contention concerning counsel's failure to subpoena witnesses, that is simply a restatement of petitioner's ineffective assistance of counsel claim which has already been considered and rejected herein. Therefore, no further discussion is required.

As to petitioner's second contention that he is distantly related by marriage to the prosecutor, he has cited no authority, and this Court has found none, for the proposition that such

---

[22] State Rec., Vol. 2 of 3, transcript of June 17, 2014, pp. 4-6.
[23] Rec. Doc. 1, p. 11.

a relationship is, in and of itself, a violation of due process or any other federal constitutional protection. Moreover, even if state law would require recusal of the prosecutor under such circumstances, which is an issue this Court need not and does not reach, that would be of no moment in this federal proceeding. Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

### D.  Denial of Due Process

Petitioner's next claim is that he was denied his right to a fair trial and due process of law as a result of counsel's failure to interview and subpoena witnesses. However, again, that is simply a variation of petitioner's ineffective assistance of counsel claim. That claim has already been considered and rejected herein, and no further discussion is required.

### E.  Denial of Post-Conviction Counsel

Lastly, petitioner claims that his constitutional rights were violated by the state court's denial of his motion for appointment of counsel in the state post-conviction proceedings. However, the United States Supreme Court has held: "There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman v. Thompson, 501 U.S. 722, 752 (1991); accord Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further." (citation omitted)). Although the Supreme Court has observed in dicta that there might be exceptions to that blanket rule, see Martinez v. Ryan, 566 U.S. 1, 8-9 (2012), it has not yet held that such exceptions do in fact exist.

Therefore, petitioner cannot show that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, this Court should likewise deny the claim.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Timothy J. Mazique be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[24]

New Orleans, Louisiana, this twenty-fifth day of October, 2017.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[24] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.